**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| ENCHANT CHRISTMAS LIGHT MAZE ) <br> & MARKET LTD. ) <br>  ) <br>     **Plaintiff,** ) <br>  ) <br> v. ) <br>  ) <br>  ) <br> GLOWCO, LLC, EXHIBAU LLC, ) <br> PATRICK WALLAIN, and CHRIS ) <br> STACEY, ) <br>  ) <br>     **Defendants.** ) | Case No. 3:19-CV-00966 <br> **Judge Aleta A. Trauger** |

## MEMORANDUM

Enchant Christmas Light Maze & Market Ltd. ("Enchant") filed a Motion for Temporary Restraining Order ("TRO") (Docket No. 3), which the court granted on October 30, 2019, setting a hearing on whether the TRO should be converted to a preliminary injunction for November 7, 2019 (Docket No. 14). Following the presentation of evidence and argument at the hearing, the court ruled, for the reasons now set out in this Memorandum, that the TRO was lifted and the application for preliminary injunction was denied. (*See* Docket No. 34 (Order).)

## I. FINDINGS OF FACT

### A. The Disputed Sculptures

Enchant is a Canadian company that produces Christmas-themed light exhibitions at locations such as baseball stadiums. The "Enchant Christmas" show features a "Christmas light maze" and includes various Christmas- or winter-themed "light sculptures." The light sculptures, generally speaking, are three-dimensional frames on which Christmas lights or similar small sequential lights can be placed. Some look like animals, such as deer, and others look like objects,

1

such as sleighs and ice crystals. Enchant has not yet produced Enchant Christmas or any similar show in the Nashville market. Enchant concedes that it is not the only company staging Christmas light exhibitions involving light sculptures, and it claims no general right to prevent competitors from staging such exhibitions.

Enchant seeks to prevent the defendants from using ten sculptures ("Disputed Sculptures")[1] in its upcoming Nashville Christmas light exhibition, Glow Nashville, scheduled to open on November 22. Enchant alleges that the Disputed Sculptures are based on its own copyright- and trade secret-protected designs. Enchant has obtained copyright registrations for nine of the ten Disputed Sculptures and argues that the tenth sculpture's design is protected by trade secret law. The defendants deny that the Disputed Sculptures were manufactured from Enchant's designs.

Defendant Patrick Wallain operates Exhibau LLC. In 2016–17, Wallain and Exhibau worked with Enchant to produce Enchant Christmas.[2] While working with Enchant, Wallain had access to Enchant files through a Google shared folder that he had established prior to his relationship with Enchant. He also retained files from projects he worked on, including Enchant projects, as a general practice. Included in the files to which he had access and which he retained after ceasing his work with Enchant were three-dimensional design files that could be used to construct Enchant light sculptures.

Chris Stacey lives in Nashville and operates Glowco, LLC. He testified at the hearing that, in the 2017–18 timeframe, Wallain and he engaged in conversations with Enchant about the

---

[1] Enchant originally sought an injunction with regard to more sculptures, but it has since abandoned its request with regard to any sculptures other than the ten Disputed Sculptures.

[2] The evidence at the hearing suggested that Exhibau was not paid by Enchant, but by an Enchant corporate parent. The specifics of the relationships between entities in Enchant's corporate family are not determinative of the court's ruling on Enchant's motion, and the court will use "Enchant" to refer generally to all affiliated entities when acting in their capacity of producing Christmas light shows.

possibility of putting on some type of Christmas light show in Nashville in affiliation with Enchant. The evidence at the hearing was conflicting with regard to whether the show was always intended to be roughly comparable to Enchant Christmas or whether it could have had a "music festival" component. The evidence established that, regardless of any other details, all parties understood that the proposed Nashville event would include light sculptures. The parties ultimately failed to reach an agreement to present a Nashville exhibition together, and Wallain and Stacey elected to do so independently. In support of that effort, they purchased from Enchant in late 2018 some light sculptures offered for sale by Enchant. The defendants' rights to use those purchased sculptures are not at issue here.

Liang Qingdi is the owner of Shenzhen Enviroshine Technology Ltd., a Chinese company that has worked with Enchant to fabricate its sculptures. Enchant has provided a sworn Declaration by Liang. Liang has worked in the past with a company known as Lejin to make the Enchant sculptures. According to Liang, she heard from "[t]he boss at Lejin" that Patrick Wallain was soliciting companies in China to produce light sculptures. Wallain does not dispute that this solicitation occurred. According to her Declaration, Liang obtained digital files that Patrick Wallain allegedly sent to Lejin in connection with his solicitation. Much of Liang's Declaration is based on hearsay and she did not testify at the preliminary injunction hearing.

Enchant has provided a Declaration and a Report from a forensic expert, Christopher Vanadia. Vanadia, like Liang, did not testify at the hearing. Vanadia performed an analysis comparing the files allegedly obtained from Liang with Enchant's own files. Vanadia found that 37 files that had allegedly been received in China from Wallain were exact copies of Enchant files.

Wallain testified at the hearing and conceded that he or someone else at Exhibau may have sent Enchant files to Chinese manufacturers as part of a bid solicitation process. He admitted that,

3

at the very least, two-dimensional images of Enchant sculptures had been used by Exhibau in its manufacturing solicitations. However, he credibly testified that only original designs were actually used to manufacture the final light sculptures for Glow Nashville. He provided documentation and testimony regarding Exhibau's design and production process, including the use and payment of artists to independently design its own three-dimensional models. He provided examples but did not independently document the design of every Disputed Sculpture.

The court also compared the designs of the Disputed Sculptures with the defendants' allegedly infringing sculptures. Numerous differences between the parties' designs are clear to an ordinary observer. Heads, legs, and bodies are angled differently in many examples. The defendants' snowflake is significantly more ornate. One allegedly infringing bear sculpture is not only posed differently in the Glow version but has an entirely different head shape, suggestive of a different species of bear. The crystals look fairly similar, in a sense, but that can be explained by the fact that they are just crystals—simple geometric planes joined together into ice-like forms.

Based on the foregoing, the court finds that, in light of all of the evidence presented and the court's assessment of the credibility of the live witnesses, Enchant has failed to establish that the Disputed Sculptures were manufactured from design files taken from Enchant.

## B. Potential Effects of an Injunction

Stacey testified that Glow Nashville could proceed without the Disputed Sculptures, but that their unavailability would substantially hamper the show. In particular, if the defendants cannot use the disputed ice crystal sculptures, it will substantially harm the design of a central attraction of Glow Nashville, a multi-story ice crystal fortress that is built of ice crystal sculptures.

Enchant President and CEO Kevin Johnston testified that he was concerned that allowing Glow Nashville to go forward with the Disputed Sculptures could harm Enchant's goodwill and

reputation, although he did not testify that this would result from the presentation of a product inferior to Enchant's.

## II. LEGAL STANDARD

The Sixth Circuit has held that the district court must balance four factors when considering a motion for preliminary injunction under Federal Rule of Civil Procedure 65: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (citing *PACCAR Inc. v. TeleScan Techs.*, LLC, 319 F.3d 243, 249 (6th Cir. 2003)).

## III. ANALYSIS

**A. Likelihood of Success on the Merits**

1. Copyright Claims

Copyright owners have the exclusive rights to reproduce and distribute copyrighted works. 17 U.S.C. § 106(1), (3). With regard to some types of works, including sculptural works, the copyright owner also has an exclusive right to display the work publicly. 17 U.S.C. § 106(5). Included in a copyright holder's rights is the right to make "derivative works" that are not identical to, but are derived from, the original copyright-protected work. 17 U.S.C. § 106(2). Generally speaking, a person becomes liable for copyright infringement if he reproduces a copyright-protected work without either permission from the owner or, in the alternative, some legally recognized automatic right of use—such as the right to engage in fair use[3] or the right to an

---

[3] The fair use doctrine "permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1385 (6th Cir. 1996) (quoting *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 577 500 (1994)) (alteration in original).

automatic statutory license.[4] "A claim of copyright infringement requires proof of '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *ATC Distribution Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 705 (6th Cir. 2005) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).

Not all works, however, are capable of receiving copyright protection, and even a work that is subject to copyright protection may contain elements that are not protected. "The United States Constitution requires that," for a work to qualify for copyright protection, "the work [must] be 'original.'" *Tomaydo–Tomahhdo, LLC v. Vozary*, 629 F. App'x 658, 660 (6th Cir. 2015) (citing U.S. Const. art. I, § 8, cl. 8; *Feist*, 499 U.S. at 346). Copyright, moreover, "extends only to expression of ideas and not to ideas themselves." *Stromback v. New Line Cinema*, 384 F.3d 283, 296 (6th Cir. 2004) (citing 17 U.S.C. § 102(b); *Mazer v. Stein*, 347 U.S. 201, 217 (1954)). As an extension of that rule, copyright protection does not prevent the use of "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." *Id.* (quoting *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 616 (7th Cir. 1982)). As relevant to this case, for example, no party can claim a copyright interest in the generic, traditional trappings of Christmas, such as Christmas trees, reindeer, or Christmas lights.

These principles excluding copyright from the realm of pure ideas are also applicable to pure facts. Facts, like ideas, "are free to the world" and "can be appropriated by another with impunity." *Id.* (quoting *Taylor v. Metro–Goldwyn–Mayer Studios*, 115 F. Supp. 156, 157 (S.D.

---

[4] For example, Congress has created "statutory licenses [that] enable digital audio services to perform copyrighted sound recordings by paying predetermined royalty fees, without separately securing a copyright holder's permission." *SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 46 (D.C. Cir. 2018).

Cal. 1953)). As relevant to this case, for example, no party can claim a copyright in the biology or natural behavior of a particular animal. *See Folkens v. Wyland Worldwide, LLC*, 882 F.3d 768, 775 (9th Cir. 2018). Biological and behavioral facts "first expressed by nature . . . are the common heritage of humankind, and no artist may use copyright law to prevent others from depicting them." *Satava v. Lowry*, 323 F.3d 805, 813 (9th Cir. 2003).

Enchant argues that, because it has received federal copyright registrations for most of the Disputed Sculptures, the protectability of the statues is presumed and subject to *Skidmore*[5] deference. *See Varsity Brands, Inc. v. Star Athletica, LLC*, 799 F.3d 468, 479 (6th Cir. 2015), *aff'd sub nom. Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002 (2017) (not citing *Skidmore*). Even accepting that Enchant has some protectable copyright interest in its sculptures, however, that does not resolve the question of how comprehensive that interest is. A party may have a valid copyright interest in a work that contains numerous unprotectable elements—for example, a copyright interest in an academic book about history, containing thousands of unprotectable facts. Enchant's registrations provide no meaningful guidance with regard to how broadly the court should construe Enchant's rights.

The Sixth Circuit has set forth a two-step test for determining the scope of copyright protection for a work involving the expression of non-copyrightable matter: "the first step 'requires identifying which aspects of the artist's work, if any, are protectible by copyright'; the second 'involves determining whether the allegedly infringing work is 'substantially similar' to protectible elements of the artist's work.'" *Kohus v. Mariol*, 328 F.3d 848, 855 (6th Cir. 2003) (quoting *Sturdza v. United Arab Emirates*, 281 F.3d 1287 (D.C. Cir. 2002)); *see Tailgate Beer, LLC v.*

---

[5] "*Skidmore* deference" refers to the relatively limited deference described in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *See Varsity Brands*, 799 F3d at 477–78 (comparing *Skidmore* deference to *Chevron* deference).

*Boulevard Brewing Co.*, No. 3:18-CV-00563, 2019 WL 5208186, at *13 (M.D. Tenn. Oct. 16, 2019) (Richardson, J.) ("[A]lthough a substantially similar keg could theoretically be protected, the idea of a keg in a truck is too generalized to warrant copyright protection."). Circuit courts that have considered issues regarding depictions of animals have employed the same or a similar approach. *See*, *e.g.*, *Folkens*, 882 F.3d at 775; *Wildlife Exp. Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 508 (7th Cir. 1994); *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 607 (1st Cir. 1988); *see also Carrell v. Origami Owl*, LLC, No. 18 CIV. 694 (NRB), 2019 WL 1330941, at *3 (S.D.N.Y. Mar. 25, 2019) (discussing the "*scènes à faire* doctrine" with regard to depictions of animals); *Sportsmans Warehouse, Inc. v. Fair*, 576 F. Supp. 2d 1175, 1181 (D. Colo. 2008) (considering infringement claims based on elk sculptures); *The Bandana Co., Inc. v. TJX Companies*, Case No. 05-206, 2005 WL 1201176, at *2 (W.D. Ky. May 29, 2005) ("[M]any elements are not protectible because they depict naturally occurring postures or positions. No copyright protection may be afforded to elements of expression that naturally flow from the idea of an animal sculpture.").

The evidence at the hearing suggested that Enchant takes significant efforts to render its animal light sculptures in a lifelike manner, with the exception of elements, such as stylized antlers, that are not at issue here. Comparison of the sculptures to photographic representations of animals confirms that the animal statues are lifelike both in the appearance of the animals and in the poses assumed by the animals. The non-animal sculptures also generally depict generic, natural phenomena, such as snowflakes[6] and ice crystals. Any copyright-protected interest in the designs is, therefore, very thin.

---

[6] In fact, Exhibau's snowflake is very different from Enchant's, which is almost identical to one found on the internet. (*See* Docket No. 24 at 10.)

If Enchant had established that the Contested Sculptures were made directly from Enchant's own design files, then it presumably would have established that whatever copyright-protected elements the statues had were also copied. Enchant, however, failed to establish that its design files were used for the actual manufacture of the sculptures; it appears that they were only used to initiate a bid process for the fabrication of Exhibau's independently created designs.

With regard to any inference of copying that can be drawn from the content of the designs, most of the similarities identified by Enchant are inherent to the subject matter depicted, including animal features and naturally occurring animal poses. Enchant points out one allegedly non-naturally occurring feature of one deer statue that supposedly overlaps between its design and Exhibau's relevant design, namely, an anatomically incorrect neck. The court does not find this instance of overlap sufficient to establish copying, and, as the court has found, there are also substantial differences between Enchant's designs and Exhibau's designs, tending to support an inference that Exhibau was not making direct copies from Enchant's design files. Without direct evidence of copying, the court cannot infer copying based on the overlapping features of the designs themselves. Enchant, therefore, has failed to establish a likelihood of success on the merits with regard to its copyright claim.

2. Trade Secrets

The conclusion that Enchant has failed to show a likelihood of success with regard to establishing that its design files were used to manufacture the statues is also fatal to its likelihood of success on its trade secret claims. Enchant alleges misappropriation of trade secrets under both the federal Defend Trade Secrets Act ("DTSA") and the Tennessee Uniform Trade Secrets Act ("Uniform Act"). The requirements for establishing misappropriation of a trade secret are largely the same under the DTSA and the Uniform Act. *See Ukrainian Future Credit Union v. Seikaly*,

No. 17-CV-11483, 2017 WL 5665960, at *10 n.11 (E.D. Mich. Nov. 27, 2017) ("The DTSA has a similar trade secret definition to the UTSA and was intended to be substantially similar to the UTSA definition."); *Phyllis Schlafly Revocable Tr. v. Cori*, No. 4:16-CV-016-31-JAR, 2016 WL 6611133, at *2 (E.D. Mo. Nov. 9, 2016) ("The elements of Plaintiffs' trade secret misappropriation claims under the DTSA and MUTSA are essentially the same."); *see also* H.R. REP. 114-529 ("While other minor differences between the UTSA and Federal definition of a trade secret remain, the Committee does not intend for the definition of a trade secret to be meaningfully different from the scope of that definition as understood by courts in States that have adopted the UTSA.").

The Uniform Act defines a "trade secret" as:

information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that:

(A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

(B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tenn. Code Ann. § 47-25-1702.

The Uniform Act defines "misappropriation" as:

(A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(I) Used improper means to acquire knowledge of the trade secret; or

(ii) At the time of disclosure or use, knew or had reason to know that that person's knowledge of the trade secret was:

(a) Derived from or through a person who had utilized improper means to acquire it;

(b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*Id.*

The evidence showed that Enchant took some small steps to limit access to its files, although it is questionable whether its efforts were sufficient to reflect a reasonable effort to maintain secrecy. It did not have any confidentiality agreement in place with Exhibau or Wallain that would have forbidden him from using materials or know-how from his work with Enchant in future ventures, and Wallain testified that he was never told by Enchant what, if any, information he had access to while working for Enchant was confidential. Enchant, moreover, did not understand the security settings of its shared folders well enough to actually keep former contractors from accessing them, despite its alleged efforts to do so. Enchant also presented only limited evidence establishing that its designs "[d]erive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use." Tenn. Code Ann. § 47-25-1702(4)(A). Enchant publicly displays its sculptures both in its exhibitions and in marketing materials. It encourages the attendees of Enchant Christmas to take photographs. It presented no evidence that there is any aspect of the designs that could not be ascertained by a sufficiently attentive observer who viewed and photographed the finished statues.

At most, Enchant maintained some secrecy related to the specific electronic design files it used, so that anyone who wished to replicate its design would have had to create a new electronic file from scratch. Even if the defendants accessed those files, however, Enchant has failed to show that the Disputed Sculptures themselves are based on the supposedly protected designs. Enchant has therefore failed to show a likelihood of success with regard to its trade secret claims that would justify enjoining the display of the Disputed Sculptures.

## B. Remaining Preliminary Injunction Factors

Enchant has identified two types of irreparable harm that it claims it will likely suffer without an injunction: (1) the presumed harm inherent to any violation of its absolute right to control the use of its copyright-protected works, *see Sony/ATV Publ'g, LLC v. Marcos*, 651 F. App'x 482, 487 (6th Cir. 2016), and (2) harm to its goodwill among consumers who recognize the defendants' sculptures as Enchant designs. With regard to the first type of harm, Enchant's argument is largely negated by its failure to show a likelihood of success. With regard to the second, the court finds Enchant's hypothetical risk of lost goodwill implausible.

The court also finds that Enchant's alleged injuries are significantly more likely to be redressable by monetary damages than injuries in many typical copyright cases. It will likely be possible to ascertain a reasonable value of both any three-dimensional designs and any specific sculptures that the defendants used, and Enchant has already shown a willingness to sell its sculptures without any limitation on their use, display, or even duplication. There is no evidence to suggest that Enchant will meaningfully lose profits or goodwill by virtue of the alleged infringement itself, as opposed to merely from the wholly lawful act of competition.

On the other hand, the risk of harm to the defendants and the public is substantial. The defendants have sold tickets to their attraction, scheduled to open in a few weeks, and have hired

hundreds of workers to construct it. The harm to them includes not only lost revenues and damaged goodwill but substantial harm to the integrity and quality of their show—a show that all parties agree that the defendants have a right to put on.

The court notes, moreover, that even if Enchant were correct on every legal and factual issue raised by its motion, that would mean only that the defendants cut some corners in their production process and should have obtained fresh designs that nevertheless would have been highly similar to Enchant's, because the original designs, like Enchant's, would have depicted actual animals in naturally occurring poses. The defendants, moreover, were clearly capable of designing or obtaining designs for their own sculptures, because even Enchant concedes that the defendants use many designs that were not taken from Enchant. A preliminary injunction, therefore, would disrupt a highly capital-intensive creative exhibition that at least *could have been* put on in a virtually identical manner, without infringement, simply by spending a bit more money. That fact, of course, would not excuse infringement. It does, however, undermine any contention that the public interest would benefit from an injunction, particularly given that Enchant has failed to show a likelihood of success on the merits.

## IV. CONCLUSION

For the foregoing reasons, the court vacated its TRO and denied Enchant's application to convert the TRO into a preliminary injunction. (Docket No. 34.) This Memorandum confirms the reasoning behind that Order.

ALETA A. TRAUGER
United States District Judge